MEMORANDUM OF DECISION
This memorandum of decision addresses coterminous petitions brought to terminate the parental rights (TPR) of Julia H. and Alan H., the biological parents of Stephan H and to adjudicate the child uncared for and neglected. Stephan was born June, 2000: the Department of Children and Families (DCF) filed both petitions on October 27, 2000. The TPR petition alleges the single ground of an act or acts of omission or commission as to each parent. For the reasons stated below, the court finds the neglect petition in favor of the petitioner, and finds that the petitioner has failed to meet her burden of proof on the TPR issues:[2]
Trial of this highly contested matter was held on nine days in May 2002. The parties submitted comprehensive post-trial briefs on or before June 4, 2002. The petitioner and the respondent parents were vigorously represented by proficient, experienced and attentive counsel throughout the proceedings, as were the child and Patricia G., the child's maternal grandmother, who had intervened in the neglect matter.
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of the child.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study materials,[3] and the multiple other documents in evidence, including medical and hospital records; x-rays; an excerpt from a medical treatise; mental health evaluations and reports; DCF CT Page 10850 correspondence; photographs and court materials. The court has utilized the applicable legal standards[4] in considering this evidence and the testimony of trial witnesses, who included DCF personnel, a physical therapist, mental health counselors, a parenting educator, friends, family members, the foster mother, the respondent father,[5] a psychologist, and numerous physicians.[6] Upon deliberation, the court finds that these facts were proven by clear and convincing evidence at trial:
I. A. Events Prior to OTC of October 27, 2000
Julia H. was born on January 23, 1969; Alan H. was born on April 20, 1969. (Exhibit 126.) Alan H., a high school graduate, operates a concrete manufacturing plant: Julia H., a college graduate, is employed at her father's property management company. (Testimony of Alan H., Andrew G.) The respondents were married in November 1999. (Exhibit 107.) Both Julia H. and Alan H. had been divorced prior to their marriage, and had been mildly depressed during the immediate aftermath of the dissolution process. (Exhibit 107.) The respondents found great comfort and happiness in their union, and in preparing for the birth of their first and only child. (Testimony of Alan H., Andrew G., Immaculada S., Denise H., Michael H.)
Stephan was born on June 2000. On June 27, Julia H. and the child were discharged from hospital care, in good condition. (Exhibits 86, J; Testimony of Dr. Reece.) Stephan resided with his mother and father in comfort and safety at their home during the first eight weeks of his life. He was cared for on a daily basis by his parents and his maternal grandmother, Patricia G., who continued to assist with child care when Julia H. returned to work part time after the expiration of her maternity leave. Alan H. assisted in child care when he returned from work in the evening, and on weekends. Andrew G., Stephan's maternal grandfather, saw the child almost daily, and occasionally served as Stephan's primary caretaker. (Testimony of Alan H., Cheryl D., Andrew G., Patricia G.) Stephan was brought to a number of routine well-child examinations during this period, and he was found to be developing normally, without incident. (Exhibit 87; Testimony of Dr. Fountas, Dr. Kumar.)
Stephan continued to appear to grow in a normal, healthy fashion during the following eight weeks. His parents were proud of and pleased with their happy, responsive infant who moved all extremities in the manner customary to babies of his age. At his christening celebration on September 17, 2000, Stephan demonstrated no signs of distress although he was passed to and held by a number of doting family members and friends in attendance. When the infant appeared to be fussy, he was easily CT Page 10851 consoled by his parents, who appropriately attended to him, rocking him and talking to him softly. On all occasions, the respondent parents treated their child gently, without roughness or force. In addition to Julia H. and Alan H., many individuals visited with, held or cared for Stephan on numerous occasions in the summer and into the fall prior to October 24, 2000: no signs or signals of injury were evident to or detectable by any of the many adults who had close contact with Stephan during this period.[7] (Exhibits Z-10, Z-11, Z-16: Testimony of Denise H., Michael H., Evelyn G., Immaculada S., Andrew G., Robert B., Patricia G., Michael V., Steven G.)
On October 24, 2000, a small bruise was present on Stephan's right leg, near the ankle: no signs of soft-tissue trauma or other bruises were apparent elsewhere. On that day, the child guarded his right leg, and did not move it spontaneously. Julia H. brought Stephan to a scheduled routine well-child examination, but did not bring this condition to the attention of health care personnel. Rather, the bruise was discovered by pediatricians Dr. Gubbana Kumar and Dr. Diane Fountas, who saw the child at their office. Faced with such a bruise in a child who was not yet crawling or walking, both doctors suspected that Stephan was the victim of child abuse. Dr. Fountas directed that Stephan undergo further testing and examination at St. Mary's Hospital (SMH). Dr. Fountas allowed Julia H. to transport her child to the hospital, and promptly referred the case to DCF. (Testimony of Dr. Kumar, Dr. Fountas, Cheryl D.) DCF in turn contacted the local police department. (Testimony of Cheryl D.)
Upon admission to SMH, imaging studies revealed "[m]ultiple fractures at different stages of healing." (Exhibit 88.) Grossly symmetrical fractures were present in the left distal and proximal tibias, right distal and proximal tibias, right and left distal femurs, in the metaphyseal regions of each bone. (Exhibits 118, 119, 120, 122, 135; Testimony of Dr. Marcello, Dr. Ghelman. Dr. Foley, Dr. Raggio.) Grossly symmetrical bilateral fractures were also found at the distal and proximal ends of each humerus. (Exhibits 118, 119, 120, 122, 135; Testimony of Dr. Marcello, Dr. Foley.) In addition, multiple posterior rib fractures were located on the right, and a posterior rib fracture was located on the left.[8] The fractures were in different stages of healing and had not all occurred at the same time. (Exhibit 117; Testimony of Dr. Marcello. Dr. Ghelman, Dr. Foley.) Further, x-rays and examination confirmed that Stephan had no injuries or damage to his skull, brain, or retinas. (Exhibit 88; Testimony of Dr. Reece, Dr. Foley.)
Stephan' s family members were unaware of any event or factor that could have precipitated Stephan's injuries, and suggested that the CT Page 10852 fractures were caused by an underlying medical condition. DCF did not accept this explanation, but executed a 96-hour hold on October 25, 2000 and assumed custody of the child. (Exhibit 126; Testimony of Cheryl D., Joanne P.) Stephan was discharged from SMH on October 26, 2000, and placed in foster care. (Exhibit 88.) An ex parte OTC was obtained (Matasavage, J) on October 27, 2000. Stephan has remained in foster care since that time. (Testimony of Cheryl D., Joanne P.)
I. B. Events Following OTC of October 27, 2000
At a hearing held on November 6, 2000, the court (Trombley, J) sustained the OTC by agreement of the parties. Initially, DCF made no arrangements to allow the respondents to visit with their son, although the specific steps issued on October 27, 2000 (Matasavage, J.) required the respondents to visit Stephan "as often as DCF permits."[9]
(Exhibits 130, 131.)
On November 7, 2000, Stephan underwent another series of x-ray examinations at SMH. The previously identified multiple fractures were still apparent in the child's extremities, and were still in varying stages of healing. (Exhibits 88, 135.) Dr. Fountas examined Stephan at her office on that date, and found that the child was "moving all extremities [was] very active" notwithstanding his fractures. (Exhibit 87.)
On November 21, 2000, Stephan underwent another series of x-ray examinations at SMH. (Exhibit 88.) This examination demonstrated that Stephan's previously-identified leg fractures were still in the process of healing, and revealed a new fracture in the child's left proximal femur. (Exhibit XX; Testimony of Dr. Ghelman, Dr. Raggio.) On December 11, 2000, Stephan was examined by Dr. Kathleen Raggio, a pediatric orthopedic surgeon on staff at the Hospital for Special Surgery[10]
(HSS) in New York. (Exhibit B; Testimony of Dr. Raggio.)
Of their own initiative, the respondent parents arranged to receive counseling to help them deal with the stress of separation from their child. In December 2000, they began weekly treatment with Peggy S., a licensed marriage and family therapist. An experienced parenting educator, Peggy S. also taught the respondents about the stages of growth that Stephan was experiencing while he was in foster care, and worked to develop their insight into parenting issues[11] (Exhibits L. O, T; Testimony of Peggy S.)
On December 29, 2000, Julia H., Alan H., and Patricia G., the child's maternal grandmother, were arrested and charged with felony Risk of CT Page 10853 Injury to a Minor, based upon allegations that they were responsible for Stephan's fractures.[12] (Exhibit 126.)
Stephan underwent additional x-ray s at SMH on January 31, 2001 as ordered by Dr. Keggi, who provided the child's orthopedic care. (Exhibits 93, YY.) These studies revealed that Stephan's lower extremity fractures had healed in a deformed position, assuming a "bowed" shape. (Exhibit YY; Testimony of Dr. Ghelman, Dr. Foley, Dr. Raggio.)
At the order of the court, on December 13 and 19, 2000 and January 12, 2001, Julia H. was tested and interviewed by Ann Phillips, Ph.D., a licensed clinical psychologist; Alan H. underwent similar examination and evaluation on December 15, 2000 and January 8, 2001. (Exhibits 104, 105; Testimony of Dr. Phillips.) Dr. Phillips also conducted an interactional evaluation of the respondents with their son, marking the first time that Julia H. and Alan H. had seen Stephan since he entered DCF custody.[13]
(Exhibit 105; see also Exhibit 126.) During the winter of 2001, the respondents underwent court-ordered psychiatric assessments and interactional evaluations with Stephan, conducted by Richard Sadler, M.D. (Exhibits 103, 107.)
On February 1, 2001, a DCF social worker interviewed the respondents at the home of Stephan's maternal grandparents. Julia H. and Alan H. demonstrated great interest in Stephan's well-being, and they fully cooperated with the agency. DCF again deferred offering specific: reunification services, electing to wait for the distribution of Dr. Phillips's psychological report. (Testimony of Joanne P.)
Evaluation reports were presented by Dr. Sadler on February 17, 2001 and by Dr. Phillips on February 23, 2001. (Exhibits 105, 107.) Thereafter, the respondents were permitted to visit Stephan for one hour per week at DCF's offices in Torrington: this schedule has continued without significant modification. DCF staff members observe each visitation session between Stephan and the respondents. (Exhibit 139.) At first, the respondents and an observer were confined to a visitation room which measured 7' x 9'; now that Stephan is able to walk and run around, they are allowed to visit with him in a room that measures 8' x 13' in size. (Testimony of Alan H., Joanne P.) At visits, the respondents interact with their child as he colors, paints, and plays with balls, cars and other and toys. The respondents read to Stephan and share collections of family photographs. (Exhibit 107; Testimony of Alan H.)
On May 7, 2001, DCF wrote to each respondent recommending participation in individual counseling and parenting education and specifying goals the department had set for them.[14] Exhibits X-1. X-2; Testimony of Joanne CT Page 10854 P., Peggy S.) Julia H. and Alan H. promptly enrolled in a parenting education program at Catholic Family Services. From June 4 through July 30, 2001, they regularly attended all scheduled classes in the "SOS Help for Parents" program, actively participating, demonstrating motivation, and earning certificates of completion. (Exhibit K; Testimony of Yolanda R.)
On May 1, 2001, Julia H. commenced regular individual counseling with Carrol H., an experienced, licensed clinical social worker. In therapy, Julia H. addressed her personal history, and learned appropriate means for coping with the death of family members and adjusting to Stephan's absence from her home. As the result of her consistent participation in the therapy process, Julia H. gained maturity and came to have a good degree of self-awareness concerning these issues.[15] (Exhibit V; Testimony of Carrol H.)
Commencing on May 30, 2001, Alan H. attended a year of therapy sessions with Philip P., a skilled and experienced licensed clinical social worker. Philip P. found Alan H. to have symptoms of grief and mild depression which were appropriate reactions to losing custody of Stephan. A willing participant in therapy, Alan H. contributed to and benefitted from the support inherent in the treatment process. (Exhibits M, U; Testimony of Philip P.)
On November 8, 2001, Stephan underwent a DEXA scan study[16] at HSS. (Exhibit GG.) On January 11, 2002, Stephan underwent a DEXA scan study at the Yale Bone Center in New Haven (YBC). (Exhibits 92, H; Testimony of Dr. Carpenter.)
In April 2002, Dr. Sadler and Dr. Phillips each conducted repeat interactional evaluations of the respondents and Stephan, and issued new reports setting forth their respective psychiatric and psychological findings.[17] (Exhibits 136, 138; Testimony of Dr. Sadler; Dr. Phillips.)
Stephan has been examined at the office of Drs. Kumar and Fountas, and by other physicians, on multiple occasions since October 24, 2000, without detecting any sequellae from his fractures or any related conditions other than those noted herein. (Exhibits 87, 89, 90.) On April 5, 2001, Dr. Fountas performed Stephan's nine-month well-child visit, and found him to be without discomfort, moving his arms and legs well, and developing well.[18] (Testimony of Dr. Fountas.) Stephan was discharged from orthopedic follow-up on April 30, 2001.[19] (Exhibit 93.)
I. C. THE CHILD
CT Page 10855
Upon discharge from SMH on October 26, 2000, Stephan was placed with a series of temporary foster parents. (Exhibits 87, 105, 107.) On January 5, 2001, DCF placed Stephan with Nancy F-M. and her husband: he has remained under their legal-risk foster care since that date. (Testimony of Joanne P., Nancy F-M.) From January through August 2001, Stephan received physical therapy services through the Birth-to-Three program sponsored by the Capitol Region Education Council (CREC). Stephan started sitting in May, and started walking in August 2001, and physical therapy was discontinued. (Exhibit 109; Testimony of Susan F.) Stephan is an active, happy two year old, who enjoys playing with his foster brother, loves sports activities, and is firmly attached to Nancy F-M. Stephan's foster parents love him dearly, and want to adopt him. (Testimony of Nancy F-M.)
Stephan has visited with Julia H. and Alan H. on a weekly basis since the winter of 2001. At visits, he recognizes the respondents and calls them "mama" or "dada." (Testimony of Tammy C.) Stephan is happy and comfortable in the company of his biological parents, notwithstanding the limited amount of time he spends with them: he responds well to meetings with them and fully enjoys the constant activity that takes place during visits. (Exhibit 136: Testimony of Dr. Sadler. Dr. Phillips.) Julia H. and Alan H. dearly love their son, and want him to return to their care. (Testimony of Alan H., Andrew G., Dr. Sadler.)
 II. NEGLECT ADJUDICATION
In a matter such as this, addressing coterminous petitions, "the judicial authority first determines whether the child is neglected, uncared for or dependent by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence. . . ." Practice Book § 33-12. SeeIn re Jonathan M., 255 Conn. 208, 211 n. 3, 764 A.2d 739 (2001). In making the initial determination, the court has considered the evidence in its entirety, according to the applicable legal standards. Under this analysis, the court finds, by a fair preponderance of the evidence, that Stephan H. was neglected within the meaning of General Statutes § 46b-120 (8)(B) [now § 46b-120 (9) (B) in that on October 24, 2000, while in the sole care and custody of his parents, he was denied proper medical care and attention to his bruised leg.[20] Accordingly, the court finds the allegation of neglect in favor of the petitioner.[21]
The preponderance of the evidence establishes that on October 24, 2000 a bruise was present on the lower part of Stephan's right leg, and that CT Page 10856 this bruise was neither noticed, investigated nor adequately attended to by his caretakers Julia H. or Alan H. By like standard, the evidence further establishes that on this date, Stephan was unwilling or unable to move his right leg, but that his obviously limited range of motion was not noticed, investigated or adequately attended to by his caretaker parents. As a result, this infant was denied proper care and attention, physically, until he was examined at his pediatricians' office, and he was therefore neglected as contemplated by then effective § 46b-120 (8) (B).[22] As the petitioner has met her burden of proving the relevant issues by a preponderance of the evidence, the court adjudicates Stephan to be a child who was neglected on October 24, 2000.
 III. TERMINATION OF PARENTAL RIGHTS ADJUDICATION
Having adjudicated Stephan a neglected child, the court is next called upon to determine whether the petitioner has met her burden of proving the allegations presented by the pending TPR petitions.[23] Practice Book § 33-12. "Under § 17a-112, a hearing on apetition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights . . . exists by clear and convincing evidence." (Citation omitted.) In re Quanitra M., 60 Conn. App. 96,102, ___ A.2d ___. cert. denied, 254 Conn. 903 (2000). As the petition raises upon the sole ground of an act or acts of omission or commission against each parent, the court has considered the evidence related to circumstances and events prior to October 27, 2000, when the TPR petition was filed.[24]
 III. A. LOCATION AND REUNIFICATION EFFORTS
In order to terminate parental rights, the court must find, by clear and convincing evidence, that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing that such efforts are not appropriate." General Statutes § 17a-112 (j)(1). In this context, reasonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. (Internal quotation marks omitted.) In re Hector L., [supra, 53 Conn. App. 372]."In re Antonio M.,56 Conn. App. 534, 547. 744 A.2d 915 (2000); see alsoIn re Daniel C.,63 Conn. App. 339, 362. 776 A.2d 487 (2001). Considered carefully, the clear and convincing evidence discloses that while DCF made some CT Page 10857 efforts, those efforts were "too little" to be considered reasonable under the circumstances of this particular case.[25] In re Antonio M.,
supra. 56 Conn. App. 547; see also In re Sheila J., 62 Conn. App. 470,480-82, 771 A.2d 244 (2001). The evidence further clearly and convincingly establishes that both Julia H. and Alan H. are and always have been able and willing to benefit from reunification efforts, and there has been no showing that a court has determined at a hearing that such efforts are not appropriate. Thus, in this matter, the court finds that that the petitioner has failed to meet her assigned burden of proving that DCF made reasonable efforts to reunify the respondents and their child, as contemplated by § 17a-1 12(j)(1). The Motion for Determination of Reasonable Efforts Finding is accordingly denied, the objection thereto is hereby sustained, and the Permanency Plan submitted by the petitioner is found to be inappropriate.
The evidence clearly and convincingly establishes that from the inception of this case in October 2000, DCF's plan was to terminate the respondents' parental rights and to place Stephan for adoption, notwithstanding the agency's statutory obligation to provide reunification efforts.[26] (Testimony of Joanne P.) Concurrent planning, contemplating both termination and reunification of parents and child, is clearly required by both Connecticut law and the applicable federal statutes See In re Jonathan M,, supra, 255 Conn. 241 fn31;42 U.S.C.A. §§ 671(a) (15) (B) and (F). Therefore, notwithstanding DC F's decision to pursue termination of parental rights, the agency is still obligated to proffer or facilitate adequate and appropriate services in an effort to ameliorate any mental health issues or extant deficiencies in parenting skills,[27] so as to reasonably assist Julia H. and Alan H. in achieving the statutory goal of reunification with their child.[28]
The evidence also clearly and convincingly establishes that DCF failed to meet the test of providing reasonable reunification efforts for Stephan's family. DCF extended its only quantifiable reunification effort by providing minimal opportunities for the respondents to visit with their child. Visits with the infant were effectively withheld from October 26, 2000 until midFebruary 2001, when the respondents saw Stephan during the interactional evaluations performed by Dr. Sadler and Dr. Phillips. As found in Part I. B., visitation was always supervised and limited to one hour per week, with the exception of December 2001, when DCF allowed the respondents a two-hour holiday visit with their son.
Although this time-limited visitation may be perceived as reasonable under the initial circumstances of this case,[29] other aspects of the visitation protocol, as arranged by DCF, were not reasonable in nature or CT Page 10858 extent. Upon receipt of Dr. Sadlers psychiatric addendum dated March 21, 2001, DCF was, or should have been. aware that the respondents tended to exhibit heightened anxiety when they visited with Stephan in an "artificial setting," and that such anxiety would likely create a negative effect upon the child. (Exhibit 108.) However, despite the concerns about the nature of the visitation environment and its implications for diminishing the value of the time parents and child were spending together, as expressed by both Dr. Sadler and the respondents, DCF unreasonably delayed in the evaluation or consideration of alternative sites for parent-child contact.[30] Instead, DCF continued to limit visitation to a restricted physical setting in which the respondents' anxiety level was increased, adversely affecting the respondents' ability to effectively utilize their limited time and thereby enhance their relationship with Stephan. As the evidence clearly and convincingly reveals that DCF failed to adequately take the respondents' mental health condition into consideration when designing the visitation program, the agency thereby failed to extend reasonable reunification efforts in this matter.In re Antony B., supra.54 Conn. App. 479.
DCF also made no reasonable reunification efforts in response to indications that the respondents needed assistance in learning to calmly and unhurriedly interact with their son, whom they saw briefly and infrequently. As found in Part I. B., on February 17, 2001. Dr. Sadler reported that the respondents generally tended to interact with Stephan in a "hyperactive" manner not suited for a six-month old child. (Exhibit 107; Testimony of Dr. Sadler) This information was reiterated through Dr. Phillips's report dated February 23, 2001, in which she indicated that Stephan sometimes became confused and was over-stimulated by parental interaction. (Exhibit 105.) In her report dated March 14, 2001, Dr. Phillips specifically recommended that a visitation supervisor should be made available to "provide active feedback to [the respondents] about behaviors that might be soothing/enjoyable to Stephan and behaviors which seem distressing to him." (Exhibit 106; Testimony of Dr. Phillips.) However, notwithstanding the clear identification of areas in which Julia H. and Alan H. needed constructive parenting education and the recommendation of a reasonable method for remediation, DCF failed to provide appropriate support or referrals, and failed to make reasonable efforts to assist the parents in learning how to modify their behavior so as to more appropriately interact with their child.[31] Rather than offer services in direct response to the recommendations of the forensic evaluators, DCF continued to merely observe the respondents' interactions with Stephan, noting areas of deficient parenting behaviors, recording and preserving critical commentaries without using them in a positive manner to effectuate reunification. (Testimony of Dr. Sadler; Joanne P.) CT Page 10859 Such passive involvement in visitation does not meet the test of providing "reasonable" efforts at reunifying the respondent parents with their son. In re Mariah S., supra, 61 Conn. App. 255.
The evidence clearly and convincingly establishes that it would have been reasonable and feasible for DCF to address the respondents' need for parenting education by referring the family to a program or facility which specialized in therapeutic visitation services. A skilled visitation supervisor or parent educator would have been in a position to provide direct parenting education, delivering hands-on intervention and instruction in more relaxed and effective methods of interacting with Stephan.[32] (Testimony of Joanne P., Tammy C., Peggy S.) The evidence presented from the respondents' mental health counselors consistently established that both Julia H. and Alan H. were able and willing "to benefit from reunification efforts." § 17a-112 (j)(1). (Testimony of Peggy S., Philip P., Carol H.; see also Testimony of Dr. Sadler.) In view of DCF's specific complaints that the respondents were demonstrating unsatisfactory parenting techniques in their meetings with young Stephan, and in view of the limited amount of time the respondents were permitted to spend with their child, reasonable and appropriate reunification efforts logically demanded adequate and appropriate attention to this issue through referral to a therapeutic, supervised visitation program. Instead, DCF unreasonably declined to make such a referral, and thereby allowed and permitted the respondents' ostensibly unsatisfactory parenting habits to continue unabated.[33]
Furthermore, although DCF has here alleged that a parental act, acts, omissions or commissions caused Stephan's injuries, it is notable that the agency failed to make reasonable efforts to address any underlying behaviors that might have led such abuse to occur. The agency never referred the respondents for anger or stress management, although such therapy would rationally be expected to address behaviors that may be associated with parents who inflict harm upon their children.[34] As found in Part I. B., when DCF wrote to each respondent more than six months after the child had been placed in foster care to communicate its "initial goals" for personal counseling and parenting education, no specific mention was made of the need for training to control anger and violent or abusive conduct.[35] (Exhibits X-1, X-2.) DCF unreasonably delayed for many weeks before designating counseling services for the respondents in response to the clear recommendations made by Dr. Phillips and Dr. Sadler. The fact that both Julia H. and Alan H. had commenced personal counseling before DCF's letters were sent does not render the agency's delay any more reasonable.[36]
The petitioner contends that any proffer of reunification efforts would CT Page 10860 have been without avail, as DCF had been advised by the respondents' counsel to have no direct contact with either parent. (Exhibit 129.) This argument lacks merit, as the evidence clearly reflects that the when it served DCF's purposes, the agency freely communicated with the respondents, without compunction and without interference from any party. For instance, as found in Part I. B., DCF visited with the respondents in February 2001, and engaged in open conversation with them in preparation for drafting the social studies that would support the agency's neglect and TPR petitions.[37] (Testimony of Joanne P.) In May 2001, DCF wrote separate letters to each respondent to recommend participation in counseling and parenting therapy. (Exhibits X-1, X-2.) Furthermore, the evidence generally reflects that DCF staff conversed directly with the respondents at each visitation session. In sum, the evidence fails to support the petitioner's assertion that the respondents or their counsel in any discernable way interfered with the reunification process.[38]
The respondents argue that DCF failed to make reasonable reunification efforts because the proffered visitation facilities, as described in Part I. B., were too small and thus inadequate. Upon consideration, the court declines to concur. For the majority of the visitation sessions in the most restricted setting, Stephan was an infant who could not walk or move about on his own. If the respondents had received adequate parenting instructional services, quiet bonding activities such as singing or reading to the child could easily have taken place in a small space. Thus, the respondents could have appropriately stimulated and interacted with the child during his early months without covering a large amount of ground. The evidence reflects that the respondents were, in fact, assigned to a larger visitation room when Stephan began to walk. DCF thus provided space that was adequate to meet the "needs of the parents" as well as those of the visited child. Respondents' Memorandum, dated June 4, 2001, referencing In re Jessica H., Superior Court for Juvenile Matters, Child Protection Session at Middletown (April 20, 1998, Foley,J.).
While the size of the visitation room was not a meaningful factor in the provision of reasonable services, the evidence clearly and convincingly shows that DCF's reunification efforts were overall inadequate and insufficient for the family involved in this matter. The reunification of parents and child, contemplated by § 17a-112 (j) (1), was thwarted not by the respondent's conduct, but by the department's own pre-judgment of the matter, and by DCFs intentional or unwitting inattention to the respondents' needs.[39] See In re JessicaH. supra. Such conduct on the part of the child protection agency fails to meet the test of proving, by clear and convincing evidence, that DCF CT Page 10861 "has made reasonable efforts to . . . reunify the child with the parent." § 17a-112 (j)(1). As the petitioner has failed to meet a requisite element of § 17a-112 (j)(1). she cannot prevail on this TPR petition.
 III. B. STATUTORY GROUNDS FOR TERMINATION — ACTOR ACTS OF OMISSION OR COMMISSION — § 17a-112 (j)(3)(C)
The petitioner has alleged the sole statutory ground of act or acts of omission or commission against each respondent, arguing that their parental rights should be terminated pursuant to General Statutes §17a-1 12(j)(3)(C).[40] In Part III. A., the court adjudged the petitioner's reunification efforts to be inadequate under circumstances in which the respondents were able and willing to benefit from such efforts, and in the absence of a ruling that such efforts were no longer appropriate. She thereby failed to meet the standard contemplated by § 17a-112 (j)(1). Here, the court also finds that the petitioner has failed to meet her burden of proving the elements of § 17a-1 12(j) (3)(C) by clear and convincing evidence. Accordingly, even if the court has erred in determining the absence of reasonable reunification efforts, the petitioner cannot prevail on the TPR petition against either parent.
Multiple aspects of the evidence clearly and convincingly establish that Stephan's injuries were caused by an underlying condition with a substantive medical explanation, which adversely affected him in the absence of any act, acts, omissions or commissions of any person.[41]
The testimony of credible expert witnesses and demonstrative evidence established the existence of this medical condition, which was reflected in the low density of Stephan's bones; in his associated delay in healing of the fractures; in the abnormal position in which some of the bones in his lower extremities healed; and in the occurrence of a new fracture after being removed from the custody of the respondents and the care of the maternal grandmother. Abundant clear and convincing evidence also compels the conclusion that the fractures in Stephan's extremities developed in a grossly symmetrical pattern, inconsistent with inflicted trauma or intentional insult; that neither respondent presented with any difficulties with temperament or other personality traits which would be logically consistent with violence against others; and that during the first months of his life, Stephan was treated in a prudent manner by his caregivers, his family and well-wishers.
At trial, the court received evidence from a number of highly trained physicians with skill and expertise in areas ranging from pediatrics to radiology to orthopedic conditions affecting children.[42] In CT Page 10862 evaluating their opinions, the court followed the applicable rules for assessing witness testimony.[43] "[N]othing in our law is more elementary than that the trier is the final judge of the credibility of[witnesses and of the weight to be accorded their testimony." (Internal quotation marks omitted.) Smith v. Smith, 183 Conn. 121, 123, 438 A.2d 842
(1981). "Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Internal quotation marks omitted.) Statev. Santiago, 245 Conn. 301, 318, 715 A.2d1 (1998); see also State v.Vargas, 34 Conn. App. 492, 498, 642 A.2d 47, cert. denied, 230 Conn. 907,644 A.2d 921 (1994). The trier of fact may accept or reject. in whole or in part, the testimony of any witness. See Smith v. Smith, supra,183 Conn. 123; see also State v. Vargas, supra, 34 Conn. App. 498; Connecticut Civil Jury Instructions, Credibility of Witnesses § 1.39.
In reaching its determination, the court has accepted and relied upon the opinions provided at trial by Kathleen Raggio, M.D.[44] Her detailed, comprehensive analysis and credible expert testimony provided a clear and convincing explication of the medical origins of Stephans injuries, consistent with the imaging studies and other reliable evidence produced at trial.[45] Dr. Raggio is a pediatric orthopedic physician and surgeon whom the court found, among the proffered expert witnesses, to have the most pertinent specialized education, skill, training, clinical and laboratory experience in the diagnosis and treatment of bone disorders in infants and children.[46] Particularly relevant to this case, as an orthopedic surgeon Dr. Raggio has been trained and has accumulated long experience in reading and interpreting x-ray studies as such tasks are an essential part of her diagnosis and treatment of her patients' conditions.[47] As the basis for her well-founded and clearly expressed opinions. Dr. Raggio incorporated her education, skill, training, clinical and laboratory experience; the totality of the medical histories of the child and his family; the child's pattern of bone healing; her careful review of original SMH imaging studies reflecting Stephan's condition in late 2000 and early 2001 and other medical data available; her examination of the child himself and sundry documents in evidence also relating to Stephan or his family.[48]
Upon this substantial foundation, Dr. Raggio clearly and convincingly opined that at the time in question, Stephan was affected by an idiopathic bone fragility disorder of unknown origin or extent, and that it was the underlying condition of the child's low bone density and abnormally healing bones, not child abuse or mistreatment, which caused him to develop fractures.[49] (Testimony of Dr. Raggio.) The court fully credits this opinion. Dr. Raggio's credible testimony concerning the CT Page 10863 existence of this explained medical condition and its causal relation to Stephan's fractures is consistent with the evidence which established that although eye, spinal cord, or head injuries, would commonly be associated with this type of insult to an infant, as found in Part I. A., Stephan had no injuries or damage to those structures.[50] (Exhibit 88; Testimony of Dr. Reece. Dr. Foley.) The court further credits those aspects of Dr. Raggio's testimony which lead to the conclusion Stephan's grossly symmetrical, bilateral and linear-appearing extremity fractures are medically and logically inconsistent with the process of intentional or inflicted child abuse.[51] (Testimony of Dr. Raggio; see also Exhibits 118 12)
Other features of the evidence bolster the credibility and reliability of Dr. Raggio's opinion and support the court's determination that Stephan's fractures were caused by an explained medical condition, reflected in the low density and abnormal healing of his bones, not by any acts or omissions contemplated by § 17a-1 12(j)(3)(C). Consistent with Dr. Raggio's opinion, the expert testimony provided by Dr. Robert Schneider, a board certified radiologist.[52] in dependently establishes that Stephan's bones were of low density, as measured through the DEXA scan study performed at HSS on November 8, 2001, as described in Part I. B.[53] (Exhibit H, GG; Testimony of Dr. Schneider, Dr. Raggio.) The court accepts and credits the opinions of Dr. Schneider who indicated that this DEXA scan study yielded sufficient, reliable data which established that Stephan's adjusted bone density was below normal, having measurably less bone in his body than the average patient of his age according to standards adopted by the World Health Organization.[54]
(Exhibits G, E, GG; Testimony of Dr. Raggio, Dr. Schneider; see also Testimony of Dr. Carpenter.) The court credits the thorough, detailed and clear explications of the DEXA scan studies which were separately but consistently provided through both Dr. Raggio and Dr. Schneider, along with their concurrent opinions that medical science is able to identify the presence of low bone density in some children without being able to specify the source of the disease. (Testimony of Dr. Raggio, Dr. Schneider.)
The expert testimony also credibly established that a child with such low bone density would be at a greater risk for and more prone to fracture than a child with normal bones would be, and the court accordingly finds that Stephan would thus be at risk to sustain a fracture in the absence of inflicted trauma or reckless care, simply because his bones are more fragile than normal.[55] (Testimony of Dr. Raggio, Dr. Schneider, Dr. Carpenter.) The court further credits Dr. Schneider's testimony that once Stephan developed initial fractures, he became at greater risk for another fracture in the affected bone, CT Page 10864 notwithstanding the absence of trauma, because previous fractures and low bone density are the most reliable predictors of repeat fractures. (Testimony of Dr. Schneider.) The court accepts and credits Dr. Schneiders cogent testimony concerning ramifications of fractures in a patient with low bone density, and finds that this credible testimony establishing additional, firm basis for adopting Dr. Raggio's opinion that without exposure to trauma beyond that of normal handling by the respondents, Stephan H. suffered repeat, linear appearing fractures very near the locations on the ends of his arm and leg bones where fractures had originally occurred. (Testimony of Dr. Raggio.) The evidence concerning Stephan's documented below-normal bone density again supports the determination that in Stephan's case, where fractures developed as a result of the below-normal low density of his bones, it was an explained medical condition, and not an act, acts, omissions or commissions by adult caretakers. which caused those injuries to occur.[56]
In addition, the evidence clearly and convincingly establishes that Stephan manifested a pattern of delayed healing at his fracture sites, which is also consistent with Dr. Raggio's credited opinion that the child suffered from an underlying medical condition that affected his bones, and caused his fractures to occur in the absence of any abusive treatment.[57] (Testimony of Dr. Raggio, Dr. Ghelman.) The expert testimony consistently established that while fractures heal at different rates in different children, it is generally accepted that the younger the patient, the more quickly fractured bones will heal, and that infants heal more quickly than adults. (Exhibit EE; Testimony of Dr. Ghelman, Dr. Foley, Dr. Raggio.) Abnormal bones like Stephans take longer to form the fracture-repairing structures than do normal bones. (Testimony of Dr. Foley.) The court credits and accepts the testimony of Dr. Raggio and Dr. Ghelman who effectively and consistently used the x-ray evidence to demonstrate that Stephan's leg bones remained in a state of healing for a prolonged period of time after the fractures occurred, exceeding that which would have been expected in a child of like age whose bones were of adequate density and normal in structure and composition.[58]
(Testimony of Dr. Raggio, Dr. Ghelman.) From all of this evidence, the court finds, by clear and convincing evidence, that the delayed pattern of healing in Stephan's case indicates that the child has either an abnormality affecting his bones themselves, or that the bones are adversely affected by a metabolic process involving other organs.[59]
(Testimony of Dr. Raggio.)
The evidence which clearly and convincingly indicates that Stephan's legs healed in an abnormally bowed fashion serves as yet another manifestation of the child's underlying idiopathic bone condition, again supporting Dr. Raggios opinions concerning the non-inflicted, explained CT Page 10865 medical etiology of the fractures at issue. The court credits the consistent testimony of Dr. Bernard Ghelman, a board certified radiologist, who cogently explained that the sequence of events for a normal child, having sustained the type of fractures revealed by the x-rays presented in this case, would be for the fractured bones to resume their original, natural shape as the process of healing progressed.[60]
However, as found in Part I. B., Stephan's fractured lower extremities healed in an abnormal fashion, resulting in a bowed shape to the legs. (Exhibits YY, ZZ; Testimony of Dr. Ghelman.) Dr. Raggio and Dr. Ghelman independently opined that Stephan's lower legs became bowed because his abnormal pattern of healing, discussed above, rendered his body unable to properly remodel his bones, and unable to resume the appropriate anatomical shape as the fracture resolved. The bowed pattern of healing in Stephan's legs, which was demonstrated by Dr. Ghelman and Dr. Raggio through the use of the multiple x-ray films in evidence, was clearly a direct and obvious result of the existing but unspecified medical condition which adversely affected the child's bones.[61] (Testimony of Dr. Ghelman, Dr. Raggio.) These credited opinions concerning the child's pattern of healing further impel the court to accept and rely upon Dr. Raggio's testimony that Stephan suffered from an explained, although un-named medical condition which affected his bones, and which led him to sustain the fractures in question in the absence of any act, acts, omission or commissions by his caretakers. (Testimony of Dr. Raggio.)
Still another aspect of the evidence supports the court's determination that Stephan's fractures were not caused by any parental act, acts, omission or commission as contemplated by § 17a-112 (j)(3)(C). Testimony by the physician witnesses clearly, consistently and convincingly established that the development of a new fracture, after the child had been removed from his parent's care, would provide a valid indication that Stephan was affected by a bone fragility disorder, vitiating the effect of any indications that his injuries were caused by child abuse or inflicted harm. (Testimony of Dr. Reece, Dr. Marcello.) The court credits the testimony of Dr. Ghelman and Dr. Raggio which clearly and convincingly establishes that a new fracture developed many days after Stephan was placed in foster care. (Testimony of Dr. Ghelman. Dr. Raggio.) Stephans left hip gave no evidence of fracture or injury to the proximal left femoral region when he was examined at the pediatricians office on October 24, 2000, prior to his hospital admission.[62] (Exhibit 87.) Similarly, although the physicians who read the x-rays taken at SMH on October 24, 2000 reported the presence of "bilateral distal metaphyseal corner fractures of the femurs," they reported no fracture at the proximal end of Stephan's left femur.[63]
(Emphasis added.) (Exhibit 88.) Dr. Ghelman and Dr. Raggio credibly opined that no fracture of Stephans left proximal femur was present on the CT Page 10866 films taken on October 25 or November 7, 2000 at SMH, depicting the anatomical region at issue. However, upon examination of the x-rays taken at SMH on November 21, 2000. both Dr. Ghelman and Dr. Raggio, radiologist and orthopedic surgeon alike, independently but consistently and convincingly identified a new fracture affecting Stephans proximal left femur.[64] (Testimony of Dr. Raggio, Dr. Ghelman.) Their credible testimony to the logical conclusion that Stephan had in fact sustained the fracture of his left proximal femur after he was placed in foster care, further impelling the determination that it was Stephan's explained medical condition that caused his bones to be injured, in the absence of any act or acts, omissions or commissions by the respondents.
Finally, the court finds that the psychological and psychiatric evidence presented in this case further impairs the petitioner's attempt to establish that the respondents were in any way responsible for causing, allowing or permitting Stephan's fractures to occur. Thorough examinations by two experienced forensic mental health evaluators failed to disclose any reliable indicia of personality traits, behavioral patterns or past conduct that would either presage or correlate with the respondents' abuse of their child.[65] (See Exhibits 136, 138; Testimony of Dr. Phillips, Dr. Sadler.) Dr. Sadler, the court-appointed psychiatric evaluator, holds board certifications in both child and general psychiatry: he has long experience and great skill in the diagnosis and treatment of mental health issues affecting children and their families. (Exhibit 103; Testimony of Dr. Sadler). This expert credibly and consistently opined that neither Julia H. nor Alan H. manifests any psychiatric conditions, and that neither is affected by any emotional conditions that would impair his or her ability to parent Stephan.[66] (Exhibit 103; Testimony of Dr. Sadler.) The court credits Dr. Sadlers well-founded opinion that while Julia H. demonstrates a degree of impulsiveness and unusually superficial emotional responses to past experience, these impairments do not rise to a level for clinical concern, and would not affect her intrinsic parenting abilities.[67]
Dr. Phillips's psychological evaluation of Julia H. led her to conclude that while the respondent mother lacks some capacity for objective distance or reflection, "she is intensely focused on the details of [her son's] daily care, vigilantly protective and indulgent. (Exhibit 105.) The creditable expert opinion of Carrol H., derived from her experience and a year of providing individual counseling to Julia H., indicates that this respondent has gained insight into parenting issues, the loss of her sibling, and personal growth. Consistent with Dr. Sadler, Carrol H. found that Julia H. is unaffected by any emotional issues that would adversely affect her ability to safely raise a child in her care. (Exhibit N; Testimony of Carrol H.) CT Page 10867
The court further finds ample basis for crediting and adopting Dr. Sadlers opinion that Alan H. demonstrates no significant issues insofar as his mental health or parenting capacities are concerned. (Exhibit 107; Testimony of Dr. Sadler.) In addition, the expert opinion tendered by Philip P., based upon his experience and a prolonged period of individual therapy with Alan H., credibly demonstrates both that this respondent had none of the traits that a mental health provider would associate with an abusive or violent person. and that he lacked characteristics that would in any way impair his ability to safely parent a child. (Testimony of Philip P.; see also Exhibit M.)
Overall, a review of the totality of the evidence presented through Dr. Sadler, Dr. Phillips, and the therapists Peggy S., Philip P. and Carol H. yields the conclusion that neither Julia H. nor Alan H. presents personality qualities which would impair their ability to serve as a safe and responsible parent for Stephan.[68] The credible opinions expressed by these mental health experts provide a firm basis for the court's determination that although both Julia H. and Alan H. were obviously energetic in their dealings with Stephan, neither respondent is affected by problems with controlling anger; hostile temperament; assaultive behavior with persons or things; low tolerance for frustration; or any tendency to act aggressively upon impulse. (Testimony of Dr. Sadler; see also Exhibit 105.) Based on the totality of the forensic psychiatric and psychological evidence, the court finds an overwhelming basis for concluding that neither respondent engaged in any act. acts. omission or commission as contemplated by 17-112 (j)(3)(C).
In sum, the evidence lacks any reasonable basis for concluding that when Stephan was under their care, the respondents brought about, permitted or allowed any injuries to be caused to their son. To the contrary, the totality of the evidence compels the conclusion that Stephan sustained multiple fractures as the result of the idiopathic bone disorder with which he was afflicted, the low bone density which was an element of that condition, and his innate tendency to sustain fractures of his abnormal bones during the course of normal handling and treatment by his caregivers. Stephan was not "denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for [his] physical, educational, moral or emotional well-being." § 17a-112 (j)(3)(C). As the court has found that the fractures at issue resulted from the child's underlying medical condition and as the medical basis for his fractures has been made patently clear throughout the course of the evidence, it has concluded that Stephan did not suffer from "[n]onaccidental or inadequately explained serious physical injury" CT Page 10868 within the meaning of § 17a-1 12(j)(3)(C).[69]
As the petitioner has failed to meet her burden of proving, by clear and convincing evidence, that the respondents' acts or omissions caused their son to sustain injuries, or that Stephan was affected by nonaccidental or inadequately explained serious physical injury, she cannot prevail on her sole alleged statutory ground for terminating the parental rights of either Julia H. or Alan H.
 IV. DISPOSITION
In Part I. of this opinion, the child was found to be neglected, and in Parts III. A. and III. B., the court found no grounds for terminating the respondents' parental rights. Accordingly, the court next proceeds to the dispositional phase of this matter, where it is called upon to ascertain the best interests of the child. Practice Book §§ 26-1 (D (2), 33-12. In deciding this issue, the court "may consider any of the dispositional alternatives available under the neglect . . . petition." Practice Book § 33-12. Those alternatives include, inter alia, committing Stephan to the Commissioner of Children and Families, vesting his care and custody with any person or persons found to be suitable and worthy of such responsibility by the court or, "[a]s an alternative to commitment, the court may place the child in the custody of the parent . . . with protective supervision by the Commissioner of Children and Families subject to conditions established by the court." General Statutes §46b-129 (j), as amended.[70] Applying the appropriate legal standards to the facts evident in this case.[71] the court finds that Stephan's biological parents, Julia H. and Alan H., are presently suitable and worthy of the responsibility of safely and appropriately providing his care and custody. but that the childs interests will best be served through a gradual and progressive reunification process. Accordingly, the court declines to approve the permanency plan submitted by the petitioner on February 28, 2002 (Exhibit II.). sustains the respondents' objection to the permanency plan (Exhibit JJ.), orders the commitment of the child until the date specified herein, orders subsequent placement of the child in the custody of his parents with protective supervision by the petitioner, subject to conditions and concurrent reunification protocol set forth in Part V.
In ascertaining Stephan's best interests under the circumstances of this case, the court has considered both the facts presented at trial and the applicable legal precepts. The court has examined the evidence establishing Stephan's past, present and future best interests, including his age and sense of time, as well has his interests in sustained growth, development, well-being, stability, continuity of his CT Page 10869 environment, and permanency; his length of time in foster care; the nature of his relationship with Nancy F-M. and his foster family; the nature of his contact and relationship with the respondents; and any benefit that may flow from the maintenance of a connection with his biological parents. Pamela B. v. Ment, 244 Conn. 296, 314, 709 A.2d 1089
(1998); In re Alexander C., supra, 60 Conn. App. 559; In re Shyina B.,58 Conn. App. 159, 167, 752 A.2d 1139 (2000); In re Savanna.,55 Conn. App. 807, 816, 740 A.2d 484 (1999). Under such scrutiny, and having fully considered the positive relationship that Stephan has developed with his foster parents, it remains abundantly clear that the childs best interests will be served only if he maintains his legal relationship with Julia H. and Alan H., and if he is reunited with them in an expedient fashion.
Stephan H. is now two years of age. He is described as "a delightful, engaging, engaged and appealing child. . . ." (Exhibit 138.) Stephan knows his biological parents and obviously enjoys their company:[72]
the evidence consistently established that Stephan responds well to his visits with Julia H. and Alan H. notwithstanding the limited amount of time he spends with them.[73] (Exhibits 136, 138; Testimony of Dr. Sadler, Dr. Phillips.) Stephan is healthy, well adjusted and happy in his foster home; he is well-bonded to his foster parents, treats them with great affection, has a "splendid" relationship with them, and enjoys play with his older foster brother. (Testimony of Dr. Sadler; see also Exhibit 136.) At present, Stephan is psychologically dependent upon the foster parents with whom he has resided for eighteen months: Nancy F-M. and her husband love the child deeply, and wish to adopt him.[74] (Testimony of Nancy F-M., Dr. Sadler.) All involved must understand, however, that a foster parent's love and connection to the child is one of many factors the court must consider in discerning the child's best interests, and in maximizing his opportunities to grow and develop in the future.[75] Inre Ashley S., 61 Conn. App. 658, 667, 769 A.2d 718 (2001).
The evidence equally clearly and convincingly establishes that Julia H. and Alan H. love their child: they are devoted to him now as they had been during his gestation and during the few months he remained in their care.[76] The respondents are very strongly bonded to each other, sharing a strong family focus. (Testimony of Dr. Phillips, Dr. Sadler.) They have a strong support system composed of dedicated family members and close friends who are able and willing to lovingly care for Stephan, as well. The respondents have expressed interest in Stephan's wellbeing during the course of their long separation from him, and have regularly asked DCF for information about his health, his likes and dislikes, and his personality: during the nearly two years that Stephan has been in foster care, Julia H. and Alan H. and have never strayed from their CT Page 10870 obvious commitment to the child. (Testimony of Tammy C., Alan H.)
The evidence clearly shows that the respondents are motivated to regain custody of their son. The consistency of their motivation is evidenced in part by their voluntary initiation of the counseling process with Peggy S., months prior to DCF's recommendation of specific treatment issues. In addition, they have each participated in a lengthy period of individual therapy with licensed clinical social workers which addressed each of the issues DCF identified as the subject of counseling, and have developed salutary insight and an appropriate understanding of the emotions they experienced after Stephan was removed from their care. (Exhibits X-1, X-2; Testimony of Dr. Phillips, Philip P., Peggy S., Carrol H.)
Clear and convincing evidence additionally establishes that the respondents are able and willing to learn appropriate parenting skills, although they have been long denied the opportunity to experience effective hands-on parenting education working with their own child.[77]
As found in Part III. B., the court credits Dr. Sadler's firmly based opinions that neither parent suffers from any manifest psychiatric illness or personality disorder that would have any effect upon their parenting performance: the court further credits this expert's testimony that with appropriate parenting instruction, each respondent has the capacity to do what is necessary for the child.[78] (Exhibit 107; Testimony of' Dr. Sadler.) Dr. Sadler's opinions on this subject were fully consistent with the credible opinions tendered by Philip P., the licensed clinical social worker who provided long-term individual therapy for Alan H.; Carol H., the licensed clinical social worker who provided long-term individual therapy for Julia H.; as well as Peggy S., who provided the respondents' couples therapy. The consistent expert opinions of these four mental health care experts confirm that the respondents have viable, albeit relatively unpracticed and untutored, parenting skills, as well as the capacity and motivation to keep Stephan safe, to respond to his basic needs, and to interact with him in a healthy manner.
Based on the abundant clear and convincing evidence produced at trial, the court thus concludes that Julia H. and Alan H. are able and willing to further develop their ability to care for their child. The court further concludes that the respondents are suitable and worthy of the responsibility of serving as his custodian, noting the absence of any reliable indication that Stephan's health and welfare would be at risk if he were returned to their care. The court's resultant determination that Stephan should be reunited with his parents is also derived from the clearly stated and well-founded opinions of Dr. Sadler, the court-appointed psychiatric evaluator: Dr. Sadler's thorough, thoughtful analysis and opinions establish that in the absence of a reason for CT Page 10871 terminating parental rights, Stephan should be returned to the care of his parents, notwithstanding the child's present bond with his foster family.[79] (Testimony of Dr. Sadler.) Dr. Phillips, the court-ordered psychological evaluator, agreed that if the evidence establishes that the respondent parents did not cause injury to the child, the respondents should be provided with appropriate therapy and reunified with Stephan.[80] (Testimony of Dr. Phillips.) The court fully credits Dr. Sadler's explicit opinion that while Stephan will be subject to emotional stress when he is removed from his current placement, any harm will be outweighed by the benefits of reunification with his biological parents.[81] (Testimony of Dr. Sadler.)
The facts of this case thus make it abundantly clear that Stephan' s best interests will be served if he reunited with Julia H. and Alan H. in an expedient fashion. This conclusion is consistent with the three-pronged principle that in child protection matters, the law endorses and promotes the reunification of parent and child. The principle's first prong is constitutional in nature. expressed by the United States Supreme Court's repeated acknowledgments that "the relationship between parent and child is constitutionally protected."Troxel v. Granville, 530 U.S. 57, 66. 530 U.S. 57, 120 S.Ct. 2054,147 L.Ed.2d 49 (2000)[82] "[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized" by that court. Id., 65. Fundamentally, "the "liberty' protected by the Due Process Clause includes the right of parents to "establish a home and bring up children' and "to control the education of their own.'"[83] (Citations omitted.) Id.
The Connecticut Supreme Court recently reiterated the constitutional prong of the reunification principle, reminding us "that a parent's interest in the nurture, upbringing, companionship, care, and custody of children is generally protected by the due process clause of the fourteenth amendment." Roth v. Weston, supra. 259 Conn. 214. In Roth v.Weston, the court confirmed that "family integrity is the core element upon which modern civilization is founded and that the safeguarding of familial bonds is an innate concomitant of the protective status accorded the family as a societal institution. Troxel v. Granville,
[530 U.S. 66]"[84] Roth v. Weston, supra. Conn. 217. Previously, the Connecticut Supreme Court had observed that"[t]ermination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." (Emphasis added.) In re Baby GirlCT Page 10872B., supra, 224 Conn. 280, citing Santosky v. Kramer, 455 U.S, 745, 753,102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); see also In re Jessica M,217 Conn. 459, 464-65, 586 A.2d 597 (1991). Connecticut has noted the multi-dimensional aspects of this family-oriented liberty interest, following Santosky v. Kramer, supra, 760 and recognizing that a child has a constitutional right to be raised by its biological parent: "A child,no less than a parent has a powerful interest in the preservation of theparent-child relationship." (Citations and quotation marks omitted; emphasis added.) In re Baby Girl B., supra, 281. Accordingly, in deciding the dispositional issues in this matter, this court has remained mindful that, at law, due process principles protect the fundamental rights of Julia H. and Alan H. to make decisions concerning the care, custody, and control of their son Stephan, and that these principles further protect Stephan's right to be raised by his parents.
The second prong of the parent-child reunification principle is founded upon the premise that the connection between parent and child is fundamental to the natural order of our society, while in contrast, the law "is a relatively crude instrument" insofar as the fashioning of interpersonal relationships is concerned. In re Juvenile Appeal(Anonymous), 177 Conn. 648. 662. 420 A.2d 875 (1979). Preservation of the family unit is preferred in child protection matters, as "[t]he law . . . generally does prefer the private ordering of interpersonal relationships over state intrusions on them. Goldstein, Freud Solnit, [Beyond the Best Interests of the Child (1973)]. p. 49." (Quotation marks and citation omitted.) In re Juvenile Appeal (Anonymous), supra,177 Conn. 662. Accordingly, Connecticut adheres to the principle that when a child's welfare can there be safeguarded, as in the present case, he should be placed in the case and custody of his biological parents. "[W]e must "continue to be guided by what is best for the child's welfare, but . . . place the advantages of a parent's care high in the scale of factors conducive to that welfare. In any controversy between aparent and a stranger the parent as such should have a strong initialadvantage, to be lost only where it is shown that the child's welfare plainly requires custody to be placed in the stranger.'" (Emphasis added; footnote and citations omitted). In re Juvenile Appeal (Anonymous),
supra, 177 Conn. 662 (using the term "stranger" to mean anyone not a parent, including relatives, friends, or child care agencies).
The third prong of the principle promoting reunification of parent and child is found in Connecticut's legislation which repeatedly endorses preservation of the family. For instance, as observed in Part 11. A. pursuant to § 17a-112 (j)(1), a court may not terminate parental rights unless DCF "has made reasonable efforts to . . . reunify the child with the parent." Through this requirement, the legislature has CT Page 10873 effectively charged DCF to extend such reunification efforts to the biological parents of a child in foster care. Similarly, through General Statutes § 17a-112 (k)(a), the legislature has anticipated that DCF will have "made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act." which efforts are subject to the court's consideration when determining whether to terminate parental rights. The legislative endorsement of parent-child reunification is further established through General Statutes § Sec.17a-111b (a), as amended, which enables the child protection agency or another interested party to request the court to permit suspension of attempts at family preservation, implicitly requiring the extension of such reunification efforts until a court allows them to be suspended. General Statutes § 46b-129 (k)(2), as amended, similarly addresses DCF's obligation to initiate family preservation efforts, through the implementation of a hearing at which the court must determine "whether it is appropriate to continue to make reasonable efforts to reunify [a neglected] child or youth with the parent." Consistent with the case law propounding the constitutional bases for reuniting parent and child, and the sociological tenets which promote such reunification, the effect of this legislation is to achieve, in situations like that before the court where the child's health and safety can be preserved, the return of a child to the custody of his biological parents.
Each of the three prongs of the parent-child reunification principle has clear application to the facts of the present case. As found in Part III. A., DCF has failed to provide reasonable efforts directed toward maintaining the respondents' relationship with Stephan. notwithstanding the "strong initial advantage" held by Julia H. and Alan H. in their controversy with DCF, a stranger to their child. In re Juvenile Appeal(Anonymous), supra, 177 Conn. 662. As found in Part III. B., DCF has failed to prove, by clear and convincing evidence, any act or acts of omission or commission warranting termination of parental rights in this case. again leading the court to the conclusion that there is no basis for the state's intrusion upon the private ordering of the parent child relationship established by Stephan's birth to Julia H. and Alan I-I. Id. Given the totality of the evidence in this case, respondents' constitutional right to raise their own child, Stephan's constitutional right to be placed in his parents' custody, and given the legislature's strongly expressed support for the reunification of parent and child, the court finds no reason to veer from the salutary constitutional, societal, and statutory goals discussed above. In re Troxel v.Granville, supra, 530 U.S. 65; Roth v. Weston, supra, 259 Conn. 214, Inre Baby Girl B., supra, 224 Conn. 281 § 17a-112 (j)(1); § 17a-112
(k)(2); § 17a-111b (a); § 46b-129 (k)(2). Our courts have recognized that "long-term stability is critical to a child's future CT Page 10874 health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged [litigation] on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected minors. In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276. 292. 455 A.2d 1313
(1983). As the evidence in this case clearly establishes that Stephan is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of his biological parents as caretakers. the court has fashioned orders which will implement the orderly transition of the child's return to the custody of Julia H. and Alan H.
The court readily acknowledges, as must the parties and the foster parents, that Stephan's ability to develop attachments to others must be protected and enhanced during the reunification process. Stephan's transition from life with his foster family to life with his biological family must be gradual and handled with appropriate deference both to the child's present expectations and to his future needs. Stephan's best interests will be served through a calm, graduated, organized and patient process of removal and relocation, in which the biological parents, the foster parents and DCF all focus on the child's immediate emotional and physical requirements, instead of their own.[85] In reaching this conclusion, the court credits the opinions of the psychiatric experts who testified that, given the child's age and circumstances, if the transfer of care is handled in an appropriately gradual manner, young Stephan will be helped to more easily cope with and adjust to the transition from residence with his foster family, to life with his biological parents. (Testimony of Dr. Sadler, Dr. Black.)
As they have not yet developed the intuitive skills with which some new parents are graced, before the reunification process is completed, Julia H. and Alan H. must be taught to interact with Stephan by calmly responding to his needs without constantly demanding and directing his attention. Improvement of the respondents' nurturing and parenting skills can be achieved through two parallel methods of guidance, integrated with the reunification process. First, Julia H. and Alan H. must continue to receive individual counseling directed at enhancing their personal self-confidence and developing the ability to deal with the stresses and vicissitudes that are inherent in parenting a young child.[86] Second, as recommended by Dr. Sadler, they should participate in a course of therapeutic supervised visitation which provides interaction with Stephan under conditions which will allow their parenting behaviors to be identified. modified and corrected through intervention of a professional parent-child educator or a mental-health care provider who has skill and CT Page 10875 experience in such matters. Through an immediate increase in the time allotted for parental contact while Stephan remains in DCF's custody, coupled with prompt provision of therapeutic supervised visitation services, the respondents will be enabled to both learn and demonstrate application of the parenting techniques that will be called into play when Stephan returns to their care after expiration of the commitment. Adopting the cogent recommendations of Dr. Sadler, the court has ordered that Stephan should begin to spend increasing amounts of time with his parents, progressing to overnight visits, experiencing gradual but progressive separation from his residential status with and psychological reliance upon his foster family, until full reunification with the, respondents is achieved.[87] (Testimony of Dr. Sadler. Peggy S.)
In this matter, the court has found that the petitioner failed to meet her burden of proving. by clear and convincing evidence, that DCF made reasonable efforts to reunify Julia H. and Alan H. with their child, which were required by § 17a-112 (j)(1) in view of the respondents' abilities and willingness to benefit from reunification efforts. Furthermore, the court has found that the petitioner failed to meet her burden of proving, by like standard, that Stephan's injuries were caused by any parental act or acts of omission or commission. as contemplated by § 17a-112 (j)(3)(C). The petitioner has proved, by a preponderance of the evidence that Stephan H. was a neglected child on October 24. 2000. Under the totality of the evidence, the court has determined that Stephan's best interests will be served not by permitting him to be subject to adoption by strangers, but by the provision of therapeutic visitation services and additional counseling to his biological parents. and formal, final reunification with them according to the schedule set forth below.
 V. ORDERS FOR REUNIFICATION
WHEREFORE, after due consideration of Stephan's sense of time, his need for a secure and permanent environment, the relationship he has with both his foster parents and his biological parents, and the totality of circumstances; having considered all the statutory criteria and having found that the petitioner has failed to meet her burden of proving, by clear and convincing evidence, that grounds exist for termination of parental rights, but having concluded that Stephan was a neglected child on October 24, 2000; and having concluded that Stephan's best interests will be served by his reunification with the respondents; the court DENIES the petition for Termination of Parental Rights, GRANTS the neglect petition, and issues the following ORDERS:[88]
1. Stephan H. is hereby committed to the Commissioner of Children and CT Page 10876 Families until October 18, 2002, on which date commitment shall be expire and Stephan shall be placed in the custody of Julia H. and Alan H., with protective supervision by the Commissioner of Children and Families until January 20, 2003, subject to the conditions established by the court, as set forth herein. § 46b-129 (j) Practice Book § 26(o)(2).
2. When in the presence of any adverse party. the foster parents. or the child, no party shall disparage any person or entity involved in this litigation. Each party shall cooperate to facility the orderly implementation of the orders of the court. The respondents shall permit DCF to visit Stephan and/or inspect their home on a reasonable basis during the period of commitment and protective supervision. DCF shall secure the foster parents' cooperation with the letter and spirit of these orders, which are directed at the successful transition of Stephan' s residence from their home to the home of Julia H. and Alan H.
3. During the period of commitment and protective supervision, Julia H. and Alan H. will continue to receive individual counseling to affirm their personal self-confidence and aid in developing the ability to deal with the stresses and vicissitudes inherent in the parenting process.
4. Prior to September 13, 2002, DCF will conduct an inspection of the respondents' home and the facilities the respondents have available at their home to care for Stephan. DCF and the respondents will cooperate and resolve any issues with those facilities no later than the end of business on September 20, 2002.
5. DCF will provide 1-hr. sessions of visitation between the respondents and Stephan on the following dates:
 Monday August 26, 2002 Wednesday August 28, 2002 Friday August 30, 2002
 Wednesday September 4, 2002 Friday September 6, 2002
Visitation shall take place at the DCF Offices in Torrington or at another appropriate location such as a public park or playground. if DCF's offices cannot support such visits on those days of the week. DCF may elect to supervise the visitation, but supervision is not ordered by the court. The respondents may bring age-appropriate, safe books and toys to share with Stephan. but they shall not photograph Stephan. and no family photographs will be displayed during these sessions. DCF will provide Stephan's transportation to and from the visits. CT Page 10877
6. Julia H., Alan H., and Stephan shall participate in 1-hr. supervised and coached therapeutic visitation, at a therapeutic visitation facility such as that described in Part W. of this opinion, on the following dates:
 Tuesday September 3, 2002 Thursday September 5, 2002
 Monday September 9, 2002 Tuesday September 10, 2002 Wednesday September 11, 2002
 Thursday September 12, 2002 Friday September 13, 2002
 Monday September 16, 2002 Wednesday September 18, 2002 Friday September 20, 2002
 Tuesday September 24, 2002 Thursday September 26, 2002
DCF will provide Stephan's transportation to and from the therapeutic visitation sessions. In addition to the time spent in supervised therapeutic visitation on each of the days referenced above, each week Julia H. and Alan H. will receive such additional professional intervention to improve their parenting skills as are found to be necessary by the therapeutic visitation supervisor or parent educator. On or before September 20, 2002 the respondents will demonstrate to the therapeutic visitation supervisor that they have learned and can apply the parenting techniques which are appropriate for Stephan's management, nurturing. safety and security when the child returns to their full primary care. The respondents shall secure a written report establishing their achievements in the therapeutic visitation sessions, and the report shall be provided to DCF and to the court no later than the end of business on September 24. 2002.
7. Stephan will have 1-hr. unsupervised visitation with Julia H. immediately after the therapeutic visitation sessions on these dates:
 Monday September 16, 2002 Wednesday September 18, 2002 Friday September 20, 2002 CT Page 10878
DCF will provide Stephan's transportation to and from the visits.
8. Stephan will have 2-hrs unsupervised visitation with Julia H. and/or Alan H. on these dates:
 Tuesday September 17, 2002 Thursday September 19, 2002
9. Stephan will have 2-hrs. unsupervised visitation with Julia H. and/or Alan H. immediately after the therapeutic visitation sessions on these dates:
 Tuesday September 24, 2002 Thursday September 26, 2002
DCF will provide Stephan's transportation to and from the visits.
9. Stephan will have unsupervised visitation with Julia H. and/or Alan H. at their home on from 10am to 2pm. on the following dates:
 Monday September 23, 2002 Wednesday September 25, 2002 Friday September 27, 2002
Other adults. but no children, may be present at these visits. DCF will provide Stephans transportation to and from the visits.
10. Stephan will have unsupervised visitation with Julia H. and/or Alan H. at their home on 9am to 4:30pm on the following dates:
 Monday September 30, 2002 Tuesday October 1, 2002 Wednesday October 2, 2002 Thursday October 3, 2002 Friday October 4, 2002
Monday October 7, 2002.
Other adults and children, may be present at these visits, as tolerated by the child. DCF will provide Stephans transportation to and from the visits.
11. Stephan will have overnight visitation with Julia H. and/or Alan H. at their home at the following dates and times: CT Page 10879
 Tuesday October 8, 2002 Start at 9am Wednesday October 9, 2002 End at 4:30pm Thursday October 10, 2002 Start at 9am Friday October 11, 2002 End at 4:30pm
 Monday October 14, 2002 Start at 9am Tuesday October 15, 2002 End at 4:30pm Wednesday October 16, 2002 Start at 9am Thursday October 17 2002 End at 4:30pm
DCF will provide Stephan's transportation to and from the visits.
12. In facilitating the transition of Stephan's residence during the period of commitment and throughout the period of protective supervision, the respondents shall observe and ensure that others observe the admonitions set forth in Part W. of this opinion concerning the restraint that must be exercised if there is any celebration or memorialization of the child's visits with them or his return to their care. DCF shall observe similar restraint and shall take such actions as are necessary to ensure that the foster parents exercise similar restraint in the transition process.
13. Commencing on October 18, 2002, the commitment shall expire and Stephan shall be returned to the care and custody of Julia H. and Alan H., whom the courts found to be suitable and worthy of such responsibility. Thereafter, Stephan shall reside at the respondents' home under DCF's protective supervision until that status expires on January 20. 2003. § 46b-129 (j); Practice Book § 26(o)(2). The conditions of protective supervision established by the court include:
 a. the parties' continued compliance with the orders set forth in 1-12 above;
 b. the respondent parents' reasonable utilization of the parenting skills learned and applied in their therapeutic visitation sessions; and
 c. no person or entity shall be permitted to remove the child from the state of Connecticut without express order of the court.
14. The Child Protection Session shall maintain jurisdiction over this matter during the period of commitment and protective supervision. Any post-judgment motions or other related matters shall be presented to the Child Protection Session for hearing and resolution in a timely fashion. CT Page 10880
BY THE COURT,
________________________ N. Rubinow, J.